UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATY BRAY and RICHARD BRAY,
                Plaintiffs,

                                                    No. 1:08-cv-1005

-v-

                                                    HONORABLE PAUL L. MALONEY

DOG STAR RANCH, INC,
PATRICK YARNOLD, and
CAROL YARNOLD, Personally and
Individually,
                Defendants.


OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

        Plaintiffs Katy and Richard Bray, brother and sister, filed suit against their former employer,

Defendant Dog Star Ranch, and against Defendants Patrick and Carol Yarnold. Dog Star Ranch is

owned and operated by the Yarnolds. The complaint alleges two claims under the Fair Labor

Standards Act ("FLSA"). First, Plaintiffs allege Defendants failed to appropriately compensate them

for overtime. Second, Plaintiffs allege they were discharged in retaliation for complaining about

violations of the FLSA.

        Defendants filed a motion for summary judgment (Dkt. No. 27) and supporting brief (Dkt.

No. 28). Plaintiffs filed a response. (Dkt. No. 35.) Defendants filed a reply. (Dkt. No. 41.)

Defendants move for summary judgment on several grounds. First, Defendants allege Richard Bray

was a supervisor and therefore is not entitled to overtime as of January 1, 2007. Second, Defendants

allege both Richard and Katy Bray were terminated, not because of their complaints, but due to the

manner in which they raised their complaints. Third, Defendants allege Plaintiffs failed to mitigate

their damages. Finally, Defendants argue they are entitled to offset any overpayments paid to

Plaintiffs for weeks where Plaintiffs worked less than 40 hours. Oral argument on the motion was held on March 1, 2010.

STANDARD OF REVIEW

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

BACKGROUND

Dog Star Ranch provides day care, boarding, grooming, and training services for dogs on a 48 acre wooded facility in Whitehall, Michigan. (Pl. Ex. C - C. Yarnold Dep. 29.) The Ranch employs around 12 or 13 people. (Pl. Ex. A - R. Bray Dep. 33.) Employees worked as Star Buddies, Cabin Buddies, trainers, and office administrative staff. (C. Yarnold Dep. 47.) A Cabin Buddy

cleans the facilities and does not handle the dogs. (C. Yarnold Dep. 47; R. Bray Dep. 35.) A Star Buddy handles the dogs, including feeding and medication. (C. Yarnold Dep. 47; R. Bray Dep. 34-35.)

Both Plaintiffs began working for Dog Star Ranch in 2004. Richard Bray began working at the facility in June 2004, when it opened. (C. Yarnold Dep. 25-26, 46-47.) He began as a Star Buddy and later worked as a trainer, after he received classes on training dogs. (C. Yarnold Dep. 47-48; R. Bray Dep. 32.) His employment with Dog Star Ranch ended June 23, 2008. (Pl. Ex. Q - Answers to Unemployment Benefits Questionnaire.) Katy Bray began working for Dog Star Ranch in the summer of 2004. (Pl. Ex. B - K. Bray Dep. 10.) Katy worked as a Star Buddy. (*Id.* 18.) At the end of the summer, Katy returned to school and only worked for Dog Star Ranch sporadically, approximately one weekend a month and holidays. (*Id.* 28.) In 2005 and 2006, Katy continued to work full time during the summer and sporadically during the school year. (*Id.* 39-41.) She did not work at Dog Star Ranch between January and June, 2007. (*Id.* 42.) Her employment with Dog Star Ranch ended on June 23, 2008. (*Id.* 43.)

The employees at the Dog Star Ranch were not paid for work done in excess of forty hours each week. When Richard started working at the Dog Star Ranch, he claims he and Carol reached an agreement regarding overtime hours. (R. Bray Dep. 24-25.) Under the agreement, if he worked more than 40 hours in a week, he would receive a paycheck for working 40 hours, and he would bank the extra hours and they would be applied to weeks where he worked less than 40 hours. (*Id.*at 24) If he worked less than 40 hours and did not have banked time, he would not receive a full paycheck for 40 hours' work. (*Id.* at 26.) About one year after he started working at Dog Star Ranch, Richard and Carol had another conversation in which they agreed that Richard would be paid

for 80 hours every two weeks "no matter what because of the amount of hours that I would work, that there really wasn't any yes [sic], if I missed an hour here or there or for a week that I wouldn't have made it up." (*Id.* 28.) Richard still kept track of his hours and any hours over 40 a week were banked for the purpose of paid vacations. (*Id.* 28-29.) Richard concedes, after this agreement, if he worked 75 hours instead of 80 hours, he would still get paid for 80 hours, whether he had banked hours or not. (*Id.* 31.)

Similar to Richard, Katy Bray was never paid for overtime work. (K. Bray Dep. 24.) If she worked more than 40 hours in a week, she was paid for 40 hours, and the overtime was banked for future use. (*Id.*) According to Katy, Carol asked if she would agree to this system of banking hours and told Katy that Dog Star would simply issue Katy paychecks when Katy returned to school until the banked hours were paid off. (*Id.* 25-26.) Katy acknowledges she received paychecks from Dog Star Ranch in the fall of 2004, after she had returned to school. (*Id.* 26.)

In her deposition, Carol Yarnold explained how this system evolved. Carol claims she never asked Katy to work overtime. (C. Yarnold Dep. 57.) According to Carol, if Katy worked in excess of 40 hours, it was because Katy and another employee swapped shifts. (*Id.*) This usually happened because one of the employees wanted a day off and needed someone to cover their schedule. (*Id.*) Carol explained, as long as the shifts were covered, everyone would get their full time pay and Dog Star could provide the employees with health insurance. (*Id.* 59.)

ANALYSIS

"The FLSA mandates the payment of minimum wage and overtime compensation to covered employees." *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 32 (1987). Under section 207(a)(1), employers are not to employ covered individuals "for a work week longer than forty hours unless

such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate for which he is employed." 29 U.S.C. § 207(a)(1); *see Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). Under section 207(o), *public* employers are allowed to compensate employees with "compensatory time," rather than money. 29 U.S.C. § 207(o) (emphasis added).

A. EXECUTIVE EXEMPTION

The FLSA includes a number of exemptions to the minimum wage and maximum hour requirements. *See* 29 U.S.C. § 213(a). Section 213(a)(1) exempts from those requirements "employees employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); *see ACS v. Detroit Edison Co.*, 444 F.3d 763, 767 (6th Cir. 2006). "The Secretary of Labor, as directed by statute, has adopted regulations defining a bona fide executive employee." *Speedway SuperAmerica*, 506 F.3d at 502. Under the regulations, an employee is exempt as an executive from the wage and hour requirements if he or she (1) is compensated on a salary basis of not less than $455 per week, (2) has a primary duty of management in the business in which he or she is employed, (3) customarily and regularly directs the work of two or more other employees, and (4) "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."[1] 29 C.F.R. 541.100(a).

The FLSA exemptions are affirmative defenses, for which the employer bears the burden of

---

[1]On page 14 of their brief in support, Plaintiffs define an "employee employed in a bona fide executive capacity" and cite 29 U.S.C. § 541.1(f). (Pl. Br. 14.) Section 541.1(f) was amended and moved to section 541.100, and elsewhere, in 2004. *See ACS*, 444 F.3d at 767. The executive employee exemption is now contained in subsections 541.100 through 541.106, which is subpart B of section 541.

proof. *Speedway SuperAmerica*, 506 F.3d at 501 (citing *Corning Class Works v. Brennan*, 417 U.S. 188, 196-97 (1974)). Exemptions to the FLSA must be narrowly construed against the employer seeking to assert them. *Id.* (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)). The employer bears the burden of proving that the exemption asserted applies to the employee at issue. *ACS*, 444 F.3d at 767 (quoting *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997)). All elements of the exemption must be established by a preponderance of the evidence. *Speedway SuperAmerica*, 506 F.3d at 501-502 (clarifying that the employer need not meet a heightened evidentiary standard and quoting *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 575, 576 (6th Cir. 2007)).

The regulations enacted pursuant to the FLSA provide courts with some guidance for applying the executive exemption. The regulations outline the activities typically performed by an employee who is a manager, including interviewing, selecting and training employees, setting and adjusting pay and work hours, maintaining records, handling employee complaints, disciplining employees, and apportioning work among employees, to list a few. 29 C.F.R. § 541.102. An employee who concurrently performs exempt and nonexempt duties is not disqualified from the executive exemption and such situations must be considered on a case-by-case basis. *Id.* § 541.106(a). The exempt work, however, must be the employee's "primary duty," which means the "principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a).

Defendants argue Richard Bray met all the elements of an executive as of January 1, 2007 when his pay was increased to $600 per week and his primary duties were that of a manager. Plaintiffs counter that Richard did not take on any managerial duties until the Spring of 2008. Prior to that his primary duties were that of a Star Buddy. Plaintiffs complain that the documentary

evidence submitted by Defendants do not establish *when* Richard Bray performed as a supervisor.

Viewing the facts in a light most favorable to Plaintiffs, the record does not clearly establish that Richard was a supervisor as of January 1, 2007. Because there are genuine issues of material fact about Richard's responsibilities and duties, Defendants are not entitled to summary judgment on this issue. Defendants rely primarily, but not exclusively, on Richard's deposition testimony to establish that he had supervisory responsibilities. Plaintiffs argue that many of the examples where Richard performed supervisory duties occurred after January 1, 2007, and therefore do not establish that he had supervisory responsibilities on or before January 1, 2007.

Plaintiffs have established a genuine issue of material fact on three of the four elements identified in 29 C.F.R. § 541.100(a). Plaintiffs do not contest that as of January 1, 2007, Richard met the salary basis test.[2] Beginning on that date, he was paid more than $455 per week. The second element, having a primary duty of management, has not been clearly established as of January 1, 2007. Richard testified, in September 2006 he spent the majority of his time "handling dogs, taking them on walks, picking up poop, maintenance, mowing the law," and that it was not until the "beginning of 2008 [] when I really did more, I would help out in the office." (R. Bray Dep. 177.) An employee may be considered an executive even though the majority of his or her time is spent performing non-executive duties. *See* 29 C.F.R. § 541.700(b); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113-14 (9th Cir. 2001). When Richard offered reference points during his deposition testimony, he consistently stated that he did not assume duties typically performed by a supervisor

---

[2]On December 24, 2006, Richard received a pay raise and was compensated at $15 per hour. (R. Bray Dep. 54.) Beginning on January 13, 2007 and running through June 14, 2008, Richard Bray received a paycheck every other week totaling $1,200. (Def. Ex. 5 - attachment A.) An hourly wage of $15 per hour translates to $600 per forty hour week or $1,200 for eighty hours.

until late 2007 or 2008. For example, Richard initially provided Carol Yarnold input on the work schedule. (*Id.* 39-42.) It was not until some point in 2008, that Richard "officially started actually doing the schedule." (R. Bray Dep. 42; *see* K. Bray Dep. 35.) At that point, other employees had to submit requests for time off to Richard, rather than Carol. (R. Bray Dep. 42; K. Bray Dep. 36.) Richard still consulted Carol, who would check the schedule for problems. (R. Bray 45.) As a second example, Richard participated in staff meetings and started presenting at staff meetings in late 2007 or early 2008. (*Id.*. 70-71.)

Weighing in Defendants' favor, the record does provide some evidence that, prior to January 1, 2007, Richard performed duties typically performed by a supervisor. Richard admits he created policy documents for the Cabin Buddies, including a list of daily procedures, instructions on cleaning kennels. (*Id.* 138-39.) He created these instructional documents at Carol's request because he had experience doing the job. (*Id.* 139.) Considering all the facts in Richard's situation, the record does not establish that, as of January 1, 2007, Richard's primary duties, his "main, major or most important" duties, were those of a supervisor. *See* 29 C.F.R. § 541.700(a). Furthermore, prior to 2007 the record does not clearly establish that Richard performed many of the duties typically reserved for a supervisor with "relative freedom from direct supervision." *Id.*

The third element, directing the work of two or more employees, has not been clearly established as of January 1, 2007. Richard testified that at some point in 2007, about a year before his termination, he began reviewing the work of the Star Buddies and Cabin Buddies to make sure they were completing their tasks. (R. Bray Dep. 51-53.) If the day's tasks had not be performed satisfactorily, Richard would show them the proper way of doing it. (*Id.* 53.) Richard would occasionally get calls at home from other employees at Dog Star Ranch. (*Id.* 66.) The employees

would call Richard to ask about work related problems when the Yarnolds were on vacation or otherwise unavailable. (*Id.* 67.) Defendants have offered no evidence that Richard began performing these duties prior to January 1, 2007.

Defendants have offered statements from several former or current employees at Dog Star Ranch, all of whom state that they considered Richard their supervisor. These statements suffer the same problem as the other evidence offered by Defendants, they do not establish that Richard supervised these individuals as of January 1, 2007. Lorri Keller worked for Dog Star Ranch between September 2006 and November 2008. (Def. Ex. 6 - Keller Statement, 1.) According to Keller, Richard was in charge of the boarding, day care and training areas of the facility and was responsible for organizing the Cabin Buddies. (*Id.*) Richard also made the schedule and handled employee problems, although he then reported the problems to Carol who would ultimately handle the situation. (*Id.*, 2.) John Kukowski worked for Dog Star Ranch for nine months, ending in July 2008.[3] (Def. Ex. 7 - Kukowski Statement, 1.) According to Kukowski, Richard interviewed him and called him to tell him he had been hired. (*Id.*) Kukowski took directions for as many as four people, including Richard. (*Id.*, 2.) If he needed time off or could not work a scheduled shift, Kukowski would call Richard or Carol. (*Id.*, 1.) Ana Hladki, who has been working at the Dog Star Ranch since August 2005, considered Richard to be the supervisor. (Def. Ex. 8 - Hladki Statement ¶¶ 6, 8.) According to Hladki, Richard did the scheduling, assigned tasks, instructed individuals on tasks, and corrected her when tasks were not done properly. (*Id.* ¶¶ 6-9.) Finally, Jen Hutchinson, the current office manager who began working at the Dog Star Ranch in September 2005, states Richard was responsible for assigning duties to Star Buddies and Cabin Buddies. (Def. Ex. 9 -

_____

[3]Because Kukowski did not start working until after January 1, 2007, it is unclear how he would have personal knowledge about Richard's duties at the Ranch prior to that date.

Hutchinson Statement ¶ 7.)  According to Hutchinson, the buddies would check in with Richard at the beginning of each day to get a list of daily tasks and they had to check out at the end of each day with Richard to make sure the tasks were completed.  (*Id.* ¶ 8.)  Other than the dates of their employment with Dog Star Ranch, these statements provide nothing from which this court might infer that Richard performed these supervisory responsibilities as of January 1, 2007.

Finally, the fourth element, hiring and firing of other employees, has not been clearly established as of January 1, 2007.  Defendants need not establish that Richard had the authority to hire or terminate others as of January 1, 2007, rather, they only need to show Richard's suggestions or recommendations for hiring and termination were "given particular weight."  29 C.F.R. § 541.100(a)(4).  The regulations clarify that when interpreting the phrase "particular weight," court should consider the frequency with which suggestions and recommendations are made.  *Id.* § 541.105.  Furthermore, the fact that a higher level manager may ultimately have the final decision does not necessarily mean that the recommendation was not afforded particular weight.  *Id.* Weighing in Defendants' favor, Richard terminated an employee in 2006.  (Pl Ex. G - R. Bray Affidavit ¶ 4.)  Carol asked Richard to watch the employee, and Richard and Carol agreed, based on the employee's actions, the employee needed to be terminated.  (R. Bray Dep. 178.)  This incident, however, is too isolated to clearly establish Richard's authority.  Richard admits he conducted interviews by himself, but not until late 2007.  (*Id.* 74.)  Richard denies making decisions to hire someone on his own.  (*Id.* 76.)  Although there is evidence of some authority to terminate prior to the beginning of 2007, the record is best characterized as one that presents a genuine issue of material fact.

B.  RETALIATION

In order to establish a claim for retaliation under the FLSA, the plaintiff must show (1) he or she engaged in protected activity, (2) the defendant was aware of the plaintiff's protected activity, (3) the plaintiff suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Williams v. GMC*, 187 F.3d 553, 568 (6th Cir. 1999) (involving a retaliation claim under Title VII). The FLSA prohibits employers from retaliating against employee who, among other things, files a complaint or institutes a proceeding under the statute. 29 U.S.C. § 215(a)(3). The Sixth Circuit has interpreted the section of the FLSA prohibiting retaliation to include retaliation against employees who informally assert their statutory rights at work. *EEOC v. Romeo Comm. Sch.*, 976 F.2d 985, 989-990 (6th Cir. 1992) (per curiam); *see also Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004) (citing *Romeo*); *McDaniel v. Transcender, LLC*, 119 F.App'x 774, (6th Cir. 2005) (citing *Romeo*). Under the familiar burden shifting framework, once a plaintiff has established a *prima facia* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its decision. *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts back to the plaintiff to demonstrate that the proffered reasons are pretextual. *Id.* at 804. The plaintiff can establish pretext by showing the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's decision, or (3) was insufficient to warrant the challenged decision. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Plaintiffs allege they were terminated for complaining about the manner in which overtime was handled at Dog Star Ranch. Plaintiffs separately complained to Carol about the system of banking overtime pay. Both Richard and Katy expressed concerns about the legality of the banking system. Both Richard and Katy were terminated after explaining their concerns to Carol.

Defendants contend Plaintiffs were not terminated for raising the issue, but for the manner in which the complaints were made. Shortly before June 13, 2008, Richard did some research on the internet and concluded the method of overtime payment at Dog Star Ranch was wrong. (R. Bray. 91, 93.) On Friday, June 13, 2008, Richard approached Carol in the parking lot when she arrived at 8:00 a.m. and asked if they could talk. (*Id.* 92.) Richard told Carol he did not believe the overtime hour bank was legal and gave her two documents he had printed from internet websites. (*Id.* 93-94.) At his deposition, Richard agreed with the questioner that the interaction with Carol was "nonconfrontational." (*Id.* 94.) Elizabeth Schaub and Rebecca Herbert observed the conversation in the parking lot and did not hear either Richard or Carol raise their voices or get upset. (Schaub Affidavit ¶ 11; Pl. Ex. I - Herbert Affidavit ¶ 7.) The next day, Carol and Pat left for a vacation. (*Id.* 95-96.)

Carol Yarnold offers a different version of her conversation with Richard. She recalls Richard was waiting for her to arrive and spoke to her "with a very upset attitude." (C. Yarnold Dep. 67.) Carol described Richard as "disrespectful," "very agitated, angry." (*Id.* 69.) The conversation lasted about 20 minutes and by the end Richard had calmed down. (*Id.* 68.) Carol and Richard both recall that Carol agreed to look into the situation. (R. Bray Dep. 95; C. Yarnold Dep. 68.) Julie Rescigno, an employee of Dog Star Ranch, recalls hearing a conversation between Richard and Carol just prior to Carol leaving for vacation. (Pl. Ex. E - Rescigno Dep. 75.) Rescigno remembers hearing Richard "raising his voice loudly at Carol." (*Id.*) Rescigno looked in Carol's office and saw the two sitting across from each other. (*Id.* 76.) She observed Richard raise up out of his chair quickly and lean toward Carol by placing his hands on the desk. (*Id.* 76-77.)

The Yarnolds first day at the Dog Star Ranch after returning from their vacation was June

28, 2008.  Katy had also done some internet research on the overtime issue.  (K. Bray Dep. 55.)

Katy approached Carol on June 28 around 9:00 a.m. and asked if Katy and two other employees could speak with Carol later in the week about "overbooking, employee satisfaction, generally, and about how we were being paid."  (*Id.* 58.)  Later, around noon, Carol approached Katy and asked if they could talk.  (*Id.* 59.)  The two went to the training area and sat down and Carol asked Katy what she wanted to discuss at the meeting.  (*Id.* 59-60.)  When Katy mentioned she thought the employees were being paid illegally, Carol disagreed.  (*Id.* 60.)  As the conversation continued, Carol told Katy that she felt as though Katy was stabbing her in the back and that Katy had agreed to the pay system.  (*Id.* 66, 69.)  Patrick Yarnold then entered the area and joined the conversation. (*Id.*)  He was upset that the topic was being brought up and began to get worked up to the point where he was shouting, and then he left.  (*Id.* 69-70.)  Carol and Katy continued to discuss the issue after Patrick left and Katy expressed an interest in getting information showing that the payment system was legal.  (*Id.* 70.)  At some point Carol got fed up and "said that's it, Katy, you're fired." (*Id.*)  The two talked more and both calmed down before leaving the area.  (*Id.* 70-71.)  Katy asked Carol if Carol wanted her to come in the morning, because she wasn't sure if she was still fired.  (*Id.* 71.)  The two entered another portion of the building where several other employees were working. (*Id.* 73-74.)  As they were walking, Katy expressed an interest in remaining, but still wanted documentation on the payment system.  (*Id.* 71-73.)  At that point, Carol told Katy "you don't get to throw your weight around in front of other employees.  Get your stuff and leave." (*Id.* 74.)  Katy denies ever raising her voice during the conversation.  (*Id.*)  Both Schaub and Herbert observed Carol fire Katy and both agree that Carol and Katy were frustrated, but calm. (Schaub Affidavit ¶ 14; Herbert Affidavit ¶ 10.)  Both Schaub and Herbert heard Carol ask Katy if she wanted to come

back the next day and heard Katy express interest, but that she had concerns about the way the employees were getting paid. (Schaub Affidavit ¶ 14; Herbert Affidavit ¶ 10.) It was then that Carol told Katy not to come back to work. (Schaub Affidavit ¶ 14; Herbert Affidavit ¶ 10.)

Carol Yarnold generally agrees with how the conversation occurred. Carol admits she approached Katy and asked if the two could talk. (C. Yarnold Dep. 81.) The two walked to the back and Katy accused Carol of paying them in a manner that was against the law. (*Id.* 82.) The conversation "got a little heated" and then Patrick joined the discussion. (*Id.*) Carol admits, "in the heat of the moment, that, you know, she was fired, I'm not going to have someone disrespect me, you know, talk the way she was talking about the business." (*Id.*) Carol recalls the two walking out and telling Katy she would like for Katy to come back and that she would look into what Katy was claiming. (*Id.* 83.) Carol told Katy to come back the next day. (*Id.*) When the two got to the front area, where other employees were working, Katy turned to Carol and said she would be back tomorrow when Carol had proof that the way the business was being run was legitimate. (*Id.* 83-84.) Because of Katy's attitude, Carol told Katy to get her stuff, she was gone. (*Id.* 84.) Carol explained she felt disrespected and that Katy was trying to deface her in front of other employees. (*Id.*)

The same day, Carol told Richard to go to lunch and then come out to the Yarnold's house so that she and Patrick could speak with him. (R. Bray Dep. 104.) Richard went home for lunch and then called Carol and asked to meet someplace more public and further stated that he wanted to bring someone along. (*Id.* 105.) Carol agreed to meet Richard at the Dog Star Ranch at 6:00 p.m. (*Id.*) About 3:45 p.m. Patrick called Richard and expressed frustration that he and Carol were being accused of doing something illegal. (*Id.* 134-35.) At some point during the conversation, Richard asked Patrick if he should come to work in the morning, to which Patrick replied "hell, no, who the

F are you, you don't work here anymore." (*Id.*)  Richard's father, Dick Bray, and Rebecca Herbert

were both in the room when Patrick called.  (Herbert Affidavit ¶ 11; Pl. Ex. F - D. Bray Dep. 27.)

Although both Mr. Bray and Rebecca were across the room, they could hear Patrick yelling at

Richard through Richard's cell phone.  (Herbert Affidavit ¶ 11; Pl. Ex. F - D. Bray Dep. 28.)

Patrick Yarnold recalls a different version of events.  Patrick remembers going to Dog Star

Ranch found Carol in a meeting with Katy.  (Pl. Ex. D - P. Yarnold Dep. 59.)  When he walked back

to the area where Carol and Katy were meeting, he could hear Katy yelling at Carol.  (*Id.* 60.)  When

he tried to interrupt, Carol said she could handle the situation and told Patrick to leave, which he did.

(*Id.* 60-61.)  Patrick decided to call Richard.  (*Id.* 61.)  On the phone, Richard was disrespectful,

raised his voice and inferred corruption.  (*Id.*)  Patrick then accused Richard of yelling at Carol, told

Richard his sister Katy was yelling at Carol, that their behavior was unacceptable, and that Richard

did not have a job at Dog Star Ranch anymore.  (*Id.*)

The retaliation issue in this case is contested at the third stage of the *McDonnell

Douglas* burden shifting scheme, whether the legitimate reason proffered by Defendants for the

adverse employment action was pretext.  Plaintiffs have offered a *prima facie* case of retaliation and

Defendants have offered a legitimate reason for its decision to terminate Plaintiffs.  Defendants cite

authority from a number of circuits for the proposition that unruly, disruptive, and disrespectful

behavior constitutes a legitimate reason for terminating an employee, even when the behavior is

connected with an activity protected by antidiscrimination statutes.[4]  *See Harrison v. Admin. Review

Bd.*, 309 F.3d 752, 759 (2d Cir. 2004); *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000); *Kiel v. Select

Artifiicials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d

---

[4]Defendants also cited several district court cases

98, 102 (8th Cir. 1995) (citing *Booker v. Brown & Williamson Tobacco, Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989)); *Kahn v. Sec. of Labor*, 64 F.3d 271, 279 (7th Cir. 1995); *Jennings v. Tinley Park Cmty. Consol. Sch. Dist. No. 146*, 864 F.2d 1368, 1375 (7th Cir. 1988); *Holden v. Owens-Wilson, Inc.*, 793 F.2d 745, 753 (6th Cir. 1986).

Plaintiffs have identified sufficient evidence in the record to create a genuine issue of material fact as to whether Defendants' proffered reason for their termination has a basis in fact. *See Manzer*, 29 F.3d at 1084. The record does not clearly establish that Plaintiffs' conduct was unruly, disruptive, or disrespectful. Patrick testified he heard Katy yell at Carol, although neither Katy nor Carol testified that their conversation included raised voices. Katy testified she never raised her voice during her meeting with Carol. Rescigno testified she heard Richard yell at Carol, but Carol did not indicate that her conversation with Richard included raised voices. Richard testified that his meeting with Carol was nonconfrontational. During the time Katy and Richard were alleged to have raised their voices, the meetings were taking place in private areas, away from other employees. *See Kiel*, 169 F.3d at 1134 (involving an episode lasting a few minutes in front of four other employees). Katy's statement, in front of other employees, reiterating her desire for proof that the overtime practice was legal is not clearly a "deliberate attempt[] to undermine a superior's ability to perform [her] job." *See Jennings*, 864 F.2d at 1375. Furthermore, Carol, the individual who was allegedly yelled at, did not decide to terminate either Richard or Katy because of their allegedly loud voices. Patrick, not Carol, terminated Richard more than one week after the incident occurred. Carol told Katy she still had her job after the alleged yelling took place. The record does not show Plaintiffs used curse words or threatened Carol. *See Kahn*, 64 F.3d at 280 (involving an employee who, among other things, exhibited foul language and unconsented and unwarranted touching of another).

16

Defendants have not alleged the meetings, even assuming voices were raised, violated rules at Dog Star Ranch or interfered with the attainment of the Ranch's goals. *See Booker*, 879 F.2d at 1312 (citing *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985)). The protests were limited to two meetings with Carol and the record does not clearly establish that these meetings disrupted either Plaintiffs' work, Carol's work, or the work of any other employee. *See Matima*, 228 F.3d at 80-81. Finally, Defendants' subjective interpretation of Plaintiffs' tone, attitude and statements do not have objective support on this record. Subjective interpretations of a disrespectful tone or attitude are not something easily challenged or disproven. If an employer were able to terminate an employee who challenged an illegal employment practice simply because the employer "felt" as though the employee was being disrespectful, few, if any, employees would be able to establish a retaliation claim. Therefore, whether Plaintiffs' tone and attitude were sufficiently disrespectful to justify their termination is a question that must be answered by the jury.

### C. MITIGATION OF DAMAGES

A wrongfully discharged employee is only required to make reasonable efforts to mitigate damages, "and is not held to the highest standard of diligence." *NLRB v. Jackson Hosp. Corp.*, 557 F.3d 301, 307 (6th Cir. 2009) (quoting *NLRB v. Westin Hotel*, 758 F.2d 1126, 1130 (6th Cir. 1985)). "This burden is not onerous, and does not mandate that the plaintiff be successful in mitigating the damage." *Westin Hotel*, 758 F.3d at 1130 (citing *Rasimas v. Michigan Dept. Of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983)). The reasonableness of a plaintiff's effort to secure substantially equivalent employment must be evaluated in light to the plaintiff's background, experience, and the relevant job market. *Jackson Hosp.*, 557 F.3d at 307-08 (citing *Westin Hotel*, 758 F.2d at 1130 (citing *Rasimas*, 714 F.2d at 624))). Mitigation of damages is an affirmative defense and "the

burden remains on the employer to prove that the employee failed to mitigate her damages. *Id.* at 308 (citing *NLRB v. Reynolds*, 399 F.2d 668, 669 (6th Cir. 1968)); *see also Westin Hotel*, 758 F.2d at 1130 ("[B]asic principles of equity and fairness mandate that the burden of proof must remain on the employer because the employer's illegal discharge of the employee precipitated the search for another job"). "A defendant satisfies its burden only by establishing that there were substantially equivalent positions available and that the plaintiff did not use reasonable care and diligence in seeking such positions." *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 557 (6th Cir. 2006) (involving a claim under the Family and Medical Leave Act and citing *Rasimas*). Whether a plaintiff has exercised reasonable diligence in pursuing equivalent positions after a retaliatory discharge is a question of fact. *See Suggs v. Servicemaster Educ. Food Mgt.*, 72 F.3d 1228, 1233 (6th Cir. 1996) (involving a Title VII plaintiff claiming discrimination and citing *Rasimas*); *see also Hill v. City of Pontotoc, Mississippi*, 993 F.2d 422, 427 (5th Cir. 1993) ("Whether an injured person has mitigated his damages requires a factual assessment of the reasonableness of his conduct."); *Baggett v. Program Res., Inc.*, 806 F.2d 178, 182 (8th Cir. 1986) (reviewing a district court's award of backpay under the clearly erroneous standard). A plaintiff who removes himself or herself from the job market and enrolls in school "after a diligent job search does not constitute a failure to mitigate." *Killian*, 454 .3d at 557 (collecting cases from other circuits).

Neither Richard nor Katy were exemplars of determination at pursuing work after they were fired from the Dog Star Ranch. After his termination, almost every day Richard checked several websites for jobs for which he was qualified. (R. Bray Dep. 187.) For one of the websites, Talent Bank, Richard had to update his resume once a month, although he would check the website weekly. (*Id.* 189.) He started school at Baker College in September 2008. (*Id.* 145.) Richard was concerned

that once he started school he might not be able to accept or keep a job because of possible schedule conflicts.  (*Id.* 161.)  When he started school, he applied for a work study position.  (*Id.* 144-45.)  In September, October, and December he submitted resumes for janitor jobs at Hackley Hospital.  (*Id.* 145-147.)  In March 2009, he applied for a similar position at Mercy Hospital.  (*Id.* 147.)  Richard conceded these were the only jobs for which he submitted applications.  (*Id.* 148.)  He admits he did not apply for any jobs in June, July, or August of 2008.  (*Id.* 153.)  Richard took classes at Baker College during the fall semester of 2008, the winter semester in 2009 and the spring semester in 2009.[5]  (*Id.* 149, 152.)  In April 2009, Richard enlisted in the Navy.  (*Id.* 155-56.)  Richard was required by the Unemployment Insurance Agency to certify that he was available for work and that he was looking for work.  (*Id.* 162-65.)  After his unemployment benefits ran out at the end of the first year of unemployment, he filed a second claim, which was approved.  (*Id.* 190; Pl. Ex. G - R. Bray Affidavit ¶ 7.)  Under the new claim, he must apply for three jobs a week and certified every other week that he meets the requirements.  (R. Bray Affidavit ¶ 7.)

When he enrolled at Baker College, Richard completed a form entitled "Request for Approval of Vocational Training Course for Waiver of Unemployment Insurance (UI) Eligibility Requirements."  (Def. Ex. 14.)  The purpose of the form, as explained on the document, is to allow the filer to secure a waiver for the availability and seeking work eligibility requirements, while continuing to receive unemployment insurance.  (*Id.*)  Every two weeks Richard mailed a form certifying he remained in a qualifying vocational training program.  (R. Bray Dep. 165-66.)

At her deposition, Katy Bray discussed her efforts to secure employment after she was

---

[5]According to Richard, Baker College runs on a quarter system with fall classes running from September through December, winter classes running from January through March, and spring classes running from April through June.  (R. Bray Dep. 151.)  Richard took three classes or thirteen hours each quarter.  (*Id.* 149-152.)

terminated from Dog Star Ranch. In the beginning, she would spend at least half an hour every other day searching for jobs on the internet. (K. Bray Dep. 92.) She made a list of jobs she found that she would be interested in pursuing. (*Id.* 91-92.) She applied for three or four positions on the list of six that she generated. (*Id.* 92-93.) She also sent resumes to a veterinarian and for a cleaning position in an office building. (*Id.* 93.) Between June 23 and August 31, 2008, Katy also tried to join the Marines, which involved a lengthy application process. (*Id.* 96-97.) She missed entering into the officer training class in October, because her paperwork was not complete. (*Id.* 103.) The next officer training class, for which she would qualify, was not offered until May 2009. (*Id.*) Between October 31, 2008 and May 2009, Katy dropped off only one or two resumes. (*Id.* 104.)

Defendants argue Plaintiffs essentially removed themselves from the job market, making only minor attempts to seek equivalent work. Citing authority from the Second Circuit Court of Appeals, Defendants assert they need not show that substantially equivalent positions were available, if they can establish that Plaintiffs did not put forth reasonable efforts to find work. *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998); *see also Wagner v. Dillard Dept. Stores, Inc.*, 17 F.App'x 141, 153-54 (4th Cir. 2001) ("[W]e reject Wagner's argument that, to establish a Title VII plaintiff's failure to mitigate, an employer must always present evidence of available, suitable employment, even when the employer has demonstrated that the plaintiff made no reasonable attempt to find work."); *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1139 (5th Cir. 1988) ("If an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable work."). Defendants assert that Richard failed to mitigate damages when he opted to enroll in school, citing authority from the Tenth and Eleventh Circuits. *Miller v. Marsh*, 766 F.2d 490, 493 (11th Cir. 1985) and

*Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 268 (10th Cir. 1975), *overruled on other grounds by Ruckelshaus v. Sierra Club*, 463 U.S. 680, 687-88 (1983); *see also Washington v. Kroger Co.*, 671 F.2d 1072 (8th Cir. 1982). *But see Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1274 (4th Cir. 1985) (involving a plaintiff who enrolled in school, but continued to seek a full time job and holding that his status as a college student was "incidental to the essential question of whether once an unlawfully discharged Title VII claimant has exercised reasonable diligence to find similar employment, has been unable to do so, and then accepts a lower paying job" and therefore he did not fail his duty to mitigate damage by failing to continue to search for higher paid employment). Finally, Defendants contend that Richard's vocational training waiver eliminated his requirement to seek work for the purpose of unemployment benefits and establishes that he did not seek to mitigate damages.

Defendants are not entitled to summary judgment on the issue of damages. Initially, the Sixth Circuit places the burden on a defendant to show that substantially equivalent job opportunities exist as part of the affirmative defense. Defendants have not proffered evidence of the availability of equivalent jobs in the area. This court is obligated to follow the holding in *Killian* and, therefore, Defendants' motion on the issue of mitigation of damages fails as a matter of law.[6] Because the strength or weakness of a job market impacts the ability of an individual to find work, placing the burden on the defendant to establish the availability of equivalent work is necessary to determine

_____

[6]*Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168-69 (6th Cir. 1996) does not require a different conclusion. In *Thurman*, the plaintiff, who alleged race discrimination for failure to hire, sought and obtained subsequent employment. The issue regarding mitigation of damages was whether defendant's liability for backpay was tolled upon his termination for cause from his subsequent employment. Because the plaintiff sought and secured subsequent employment, there was no need for the court to discuss the defendant's burden to establish that equivalent work existed.

whether the efforts expended by a claimant were reasonable. *See Jackson Hosp.*, 557 F.3d at 307-08. Second, even without this obligation on Defendants, whether Plaintiffs' efforts were reasonably diligent is a question that should be answered by the fact finder.[7] Taking the facts in the record in a light most favorable to Plaintiffs, they reviewed job websites for available positions on a regular, although not daily, basis. Both Plaintiffs submitted a limited number of resumes and applications. Richard's decision to attend school did not undermine his ability to mitigate damages. Richard submitted resumes and applications *after* he began school. The Sixth Circuit has not held that enrollment in school necessarily removes a claimant from the job market.

### D. OFFSET OF UNDERPAYMENTS BY OVERPAYMENTS

Defendants argue they are entitled to offset the underpayments made during weeks where Plaintiffs worked overtime by overpayments made during weeks where Plaintiffs worked less than forty hours, but were paid as though they worked forty hours. Defendants have offered proof of the hours Richard and Katy worked during their employment and the paychecks they received. (Def. Ex. 5 and attachments.) Included in the exhibit is Carol Yarnold's declaration that the attachments

---

[7]This conclusion is generally consistent with the cases cited by Defendants. In *Carcano v. William J. Kline & Son, Inc.*, No. 09-cv-1178, 1998 WL 690867 (N.D.N.Y Oct. 1, 1998), the mitigation of damages issue was decided on a motion for summary judgment prior to any determination of liability. In *Miller v. Marsh*, the parties conceded the issue of liability for the purpose of a summary judgment motion on mitigation of damages. The issue in the motion was whether the plaintiff was entitled to backpay once she opted to enroll full time in school. *Miller*, 766 F.2d at 491-92. However, in the other cases cited by Defendants, the trier of fact was afforded the opportunity to determine whether the claimants mitigated damages. *See Greenway*, 143 F.3d at 49 (involving a jury trial where the jury determined both liability and backpay); *Sellers*, 902 F.2d at 90-92 (involving a trial before a magistrate judge who determined both liability and damages and later, after remand, held an additional evidentiary hearing on damages); *Taylor*, 524 F.2d at 267(involving a trial where liability and backpay were determined); *Reilly v. Cisneros*, 835 F.Supp. 96, 98 (W.D.N.Y. 1993) (involving a trial where liability was determined and a post judgment evidentiary hearing where damages were determined).

are the records kept in the regular course of business by Dog Star Ranch.  (*Id.* ¶ 8.)  Based on Plaintiffs' assertion that wilful violations of the FLSA have a three year statute of limitations for backpay, Defendants have calculated the amount of hours Richard and Katy worked and the amount of pay each received for each two week period.  (Def. Ex. 5 - attachments E and F.)  Because Defendants allege Richard Bray was a supervisor beginning in 2007, they have only calculated the hours and payments for Richard Bray for 2006.  (Def. Ex. 5 - attachment E.)  According to Defendants, Katy was underpaid (worked more hours than she was compensated) by a total of $1,608.39 and was overpaid (worked less hours than she was compensated) by a total of $3,233.15. (Def. Br. 4; Def. Ex. 5 attachment F.)  Richard was underpaid by a total of $1,647.98 and overpaid by a total of $1,750.12.  (Def. Br. 4; Def. Ex. 5 attachment E.)  Defendants acknowledge that the FLSA doubles damages and therefore doubled the amount of underpayments, before subtracting the amount of overpayments.  Defendants assert, based on this calculation, Katy's situation is a virtual wash ($16.37), and Richard $1,545.84.  (Def. Br. 4; Def. Ex. 5 attachments E and F.)  Defendants sent checks for these amounts to Plaintiffs, through their attorneys, and explained how they calculated those amounts.  (Def. Exs. 1 and 2.)

To justify their calculation of damages, Defendants rely on *Singer v. City of Waco, Texas*, No. Civ. A.W-99-CA-296, 2001 WL 34772878 (W.D. Tex. Oct. 25, 2001).  In *Singer*, the district court offset overpayments made to city firefighters during certain two week periods against underpayments made during other two week pay periods.  The district court explained that its holding was "properly characterized as a conclusion in equity.  The Court concluded that Plaintiffs would be unjustly enriched if the City's overpayments were not taken into account in any manner whatsoever, as the Plaintiffs desire."  *Id.*, * 2.  On appeal, the Fifth Circuit explained the factual

basis underlying the decision. *Singer v. City of Waco, Texas*, 324 F.3d 813, 817 (5th Cir. 2003). The firefighters would work 120 hours during two two-week periods and only 96 hours during a third two week period. The firefighters were paid the same amount for each two week period. As a result, the firefighters were overpaid when they worked 96 hours, but underpaid when they worked 120 hours. The circuit court affirmed the district court's decision to recognize the overpayments while damages arising from the underpayments. *Id.* at 826-28. The appellate court held the district court's decision could not be based on the state law doctrine of unjust enrichment. *Id.* at 826. Furthermore, the appellate court held the district court's decision could not be based on section 207(h) of the FLSA. *Id.* at 827-28. The appellate court upheld the district court's calculations on the basis that the city was paying the firefighter's *in advance* when the firefighters received their overpayments for work done during the 96 hour work week. *Id.* at 828. By paying in advance, the city did not violate the FLSA's requirement that overtime compensation be paid without unnecessary delay. *Id.* (citing 29 C.F.R. § 778.106 and *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 271 (5th Cir. 1987)).

Plaintiffs argue the *Singer* case is contrary to both the FLSA and Sixth Circuit law and is readily distinguishable. Citing *Herman v. Fabri-Ctrs. of America*, 308 F.3d 580, 590-91 (6th Cir. 2002), Plaintiffs assert employers are not entitled to offset damages from underpayments with overpayments made during other work weeks. However, the holding in *Herman* is not applicable to this situation. *Herman* involved premium payments made, regardless of overtime worked, under a collective bargaining agreement. *Id.* at 583 (quoting the lower court opinion). The issue arose under sections 207(e)(5-7) and (h), none of which are at issue here. *Id.* 586-88. Those sections were added to the FLSA to avoid creating a scenario where, as a result of calculating an employee's

24

regular rate of pay when overtime and premium payments are involved, an employer becomes liable for "overtime on overtime." *Id.* at 587. Within this context, the appellate court reversed the lower court's decision, which had allowed the employer to offset the sum total of the premiums paid, and remanded the issue for the district court to "determine the amount of compensation credit that [the defendant] may claim on a pay period by pay period basis." *Id.* at 593. The court expressly rejected the employer's assertion that without the offset the employees would receive a windfall. *Id.* at 592.

This court's own research reveals several cases from other circuits, not referenced by either party, that are analogous to Plaintiffs' situation. In *D'Camera v. District of Columbia*, 693 F.Supp. 1208 (D.D.C. 1988), police officers under the rank of sergeant brought suit for unpaid overtime. After the FLSA was amended in 1985 to allow certain public employers to compensate employees with time off, the District of Columbia, on April 15, 1986, enacted legislation providing its FLSA covered employees with compensatory time at one and one-half hours for each hour of overtime in lieu of paid overtime compensation. *Id.* at 1213. However, the collective bargaining agreement in effect between April 15, 1986 and October 1, 1987 did not authorize payment with compensatory time off in lieu of monetary overtime pay. *Id.* at 1213-14. The defendants sued for monetary pay for the overtime worked for the period between April 15, 1986 and October 1, 1987. The court concluded the collective bargaining agreement in effect during that time did not authorize overtime compensation through time off and therefore the defendants were deprived of monetary compensation to which they were legally entitled. *Id.* at 1216. In a subsequent opinion, *D'Camera v. District of Columbia*, 722 F.Supp. 799 (D.D.C. 1989), the court addressed the issue of damages. The court approved the District of Columbia's calculation of each plaintiff's backpay award. *Id.* at 803.

[F]irst, it determined the total hours of overtime the plaintiff worked during the

> violation period; second, it multiplied this number by one and a half times the plaintiff's then hourly wage to arrive at a monetary value of all overtime worked; third, it determined the total hours of compensatory time used by the plaintiff during the violation period; fourth, it multiplied this number by the plaintiff's then hourly wage to arrive at a monetary value of all overtime compensation already received; and fifth, it subtracted the monetary value of compensation received from the monetary value of overtime worked to arrive at the award of backpay.

*Id.* Acknowledging that the FLSA does not expressly authorize such a deduction, the court reasoned this approach was "fair and equitable" and made the plaintiffs whole without affording them a windfall at the District's expense. *Id.* at 803-4.

The First Circuit employed similar calculations of backpay in two cases. In *Roman v. Maietta Constr., Inc.*, 147 F.3d 71 (1st Cir. 1998), the plaintiff, a welder, accumulated 120.75 hours of overtime working on stock cars between June 1993 and August 1994. *Id.* at 73-74. Rather than paying the plaintiff overtime for the time spent on the stock cars, the defendants held the hours in reserve as compensatory time and applied the hours to weeks where the plaintiff did not work a full forty hours. *Id.* at 74. The defendants ultimately paid the plaintiff for 105 of the 120.75 hours, but at the plaintiff's regular hourly rate. *Id.* The court concluded the plaintiff was entitled to his overtime rate, one and a half times his regular rate, for the entire 120.75 hours of overtime. *Id.* at 76. However, the defendants were entitled to a credit toward the damages owed for the amount they had already paid the plaintiff when they paid him for 105 hours at his regular rate of pay. *Id.* at 76-77. The court justified its conclusion on *D'Camera* and on 29 U.S.C. § 216(b), which states that employers who violate sections 206 and 207 of the FLSA are liable for "unpaid" overtime.[8] *Id.*

In *Lupien v. City of Marlborough*, 387 F.3d 83 (1st Cir. 2004), city police officers sued the defendant alleging the city had been using a "comp time" system of overtime payments in violation

---

[8]This district has cited this particular holding favorably. *See Martin v. Indiana Michigan Power Co.*, 292 F.Supp.2d 947, 960 (W.D. Mich. 2002) (Miles, J.)

of section 207(o) of the FLSA.  Before trial, the city conceded the comp time system violated the FLSA and argued any remedy must take into account the fact that the plaintiffs had already taken advantage of the paid time off given to them in lieu of monetary payments.  *Id.* at 84.  The plaintiffs argued their backwages should be calculated "using a cash only system and allowing no offset for compensatory time taken outside the individual seven-day workweek during which the overtime compensation is due."  *Id.* at 86.  Citing *Roman*, the court concluded the City's liablity could be offset by the comp time used by the plaintiffs.  *Id.* at 89.  The court rejected the plaintiffs' calculation of damages, concluding it would result in the plaintiffs being paid three times for each hour of overtime: once in the form of paid time off, once as compensatory damages, and once as liquidated damages.  *Id.* at 90.

The court finds persuasive the calculation of damages employed in *D'Camera*, *Roman*, and *Lupien*.  Furthermore, this calculation of damages is consistent with the directives of the FLSA. Under section 207(a)(1), Plaintiffs are entitled to time-and-a-half for any hours worked in excess of forty during a given work week. Defendants liability must be determined by identifying those weeks in which Plaintiffs worked in excess of forty hours, and multiplying those excess hours by one-and-a-half times Plaintiffs' then hourly wages.  Plaintiffs, however, are only entitled to damages for their unpaid overtime compensation.  *See* 29 U.S.C. § 216(b).  Plaintiffs are entitled to be made whole; they are not entitled to a windfall at Defendants' expense.  Equity requires Defendants be credited with overpayments made to Plaintiffs during their employment.  During certain pay periods, Defendants paid Plaintiffs as though they worked forty hours a week, even though Plaintiffs worked less than the hours for which they were paid.  Defendants are entitled to a credit for those overpayments.  Accordingly, this court agrees with Defendants that they are entitled to an offset, but this court rejects Defendants' calculation of backpay.  Defendants' calculation of backpay pays

Plaintiffs for their overtime work at Plaintiffs' regular rate of pay, not at their overtime rate of pay.

## CONCLUSION

For the reasons outlined above, Defendants' motion for summary judgment (Dkt. No. 27) is GRANTED IN PART and DENIED IN PART. There are sufficient questions of material fact precluding summary judgment on the issue of Richard's status as an executive as of January 1, 2007. There are sufficient questions of material fact on the issue of retaliatory discharge, specifically concerning Defendants' proffered reason for terminating Plaintiffs. Although a close call, there are sufficient questions of material fact on the issue of mitigation of damages. Typically, mitigation of damages is an issue resolved by the finder of fact. Finally, Defendants are correct that they are entitled to an offset for any amount already paid Plaintiffs toward their overtime hours. Defendants' have not correctly calculated the backpay to which Plaintiffs are entitled.

## ORDER

For the reasons provided in the accompanying opinion, Defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED IN PART** and **DENIED IN PART. IT IS SO ORDERED.**


Date:   March 10, 2010                                       /s/ Paul L. Maloney
                                                             Paul L. Maloney
                                                             Chief United States District Judge